MICHIGAN STATE PODIATRY ASSOCIATION, et al., Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF MICHIGAN, Defendant.

Civ. A. No. 81–3412.

United States District Court, E.D. Michigan, S.D.

Aug. 24, 1987.

---

Gregory L. Curtner, Detroit, Mich., Thomas Hitch, Lansing, Mich., for plaintiffs.

Lisa DeMoss, Henry Saad, Detroit, Mich. (Kaye, Scholer, Fierman, Hays & Hays, New York City, of counsel), for defendant.

## MEMORANDUM OPINION

SUHRHEINRICH, District Judge.

This matter is before the Court on defendant Blue Cross Blue Shield of Michigan's (BCBSM) motion for summary judgment. The plaintiff class representatives (hereinafter plaintiffs) have responded to the motion, also submitting a brief to supplement their response. The Court entertained the arguments of counsel on August 3, 1987, taking those arguments under advisement. Additionally, following oral argument, the parties were given two days to file any supplemental materials which they wished the Court to consider. Each party filed a supplemental brief and supporting documents. Having carefully considered the arguments of counsel as presented in the briefs and during oral argument and having fully perused all supporting documents, the Court now renders its opinion.

### I. Procedural and Factual Background

This is the third summary judgment motion filed in this action by Blue Cross and Blue Shield of Michigan (BCBSM). The previous two motions were addressed by Judge Churchill, who denied the first on the grounds that discovery adequate for deciding a motion for summary judgment had yet to occur. See Order Denying Defendant BCBSM's Motion to Dismiss or for Summary Judgment, December 17, 1982. After taking oral arguments under advisement, Judge Churchill granted the second motion in part and denied it in part. Memorandum Opinion, October 12, 1984. Counts II, IV, and V of plaintiff MSPA's complaint were dismissed at that time. However, summary judgment for BCBSM on Counts I and III was denied. Judge Churchill concluded that sufficient fact questions existed precluding summary judgment as to the alleged conspiracy between BCBSM and the Michigan State Medical Society (MSMS) to implement the Foot Surgery Predetermination Program (Predetermination Program) and as to the alleged conspiracy between BCBSM,

MSMS, and medical doctors (MDs) to lower screens[1] on podiatric procedures.

Notably, Judge Churchill also denied the plaintiffs' motion for partial summary judgment at that time. Plaintiffs contended that they should be granted partial summary judgment based on a 1978 agreement between BCBSM and MSMS, to institute cost containment committees which excluded podiatrists. However, Judge Churchill determined that this agreement was of questionable effect on the BCBSM cost containment process. Thus, Judge Churchill determined that there were factual questions which prevented the granting of the plaintiffs' motion.

Full discovery has now taken place in this case, and BCBSM has filed its third motion for summary judgment. BCBSM's motion relies in part on case law announced by the Supreme Court since the issuance of Judge Churchill's 1984 opinion. Specifically, BCBSM contends that the Supreme Court's decision in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), mandates the granting of summary judgment in BCBSM's favor at this time. This contention shall be discussed in depth after a review of the facts in this case. BCBSM seeks summary judgment on three other grounds as well. Those grounds are: (1) that plaintiffs' claimed injury does not constitute an antitrust injury; (2) that BCBSM cannot be considered an unlawful combination of MDs by virtue of its structure, and (3) that the plaintiffs' present lawsuit is collaterally estopped by a decision rendered by the Michigan Insurance Commissioner. In that decision, the Commissioner found that BCBSM's predetermination program satisfied state insurance law requirements.

This case was initially raised by plaintiff Michigan State Podiatry Association (MSPA) in 1981. MSPA represents the majority of podiatrists in Michigan. The rest are members of the Michigan Society of Podiatric Physicians and Surgeons

---

**1.** The term "screen" refers to the set reimbursement rate which BCBSM will pay a health care provider for a specific procedure. This reimbursement rate is the amount which BCBSM deems the usual, customary, and reasonable charge for the procedure.

(MSPPS). MSPPS opposes the current MSPA litigation. In the parts of its complaint which are pertinent to the current motion, MSPA alleged that:

(1) Count I: BCBSM, an unlawful combination of MDs, violated Section 1 of the Sherman Act by unlawfully combining with MDs and MSMS to horizontally boycott podiatrists, thereby lessening or eliminating competition by podiatrists for Chrysler employee trade, and

(2) Count III: BCBSM, pursuant to its illegal combination with MSMS and MDs, engaged in price fixing when it reduced the screens which were applicable to procedures ordinarily performed by podiatrists, while maintaining or raising the screens for procedures customarily performed by MDs.

These allegations arose out of two cost containment practices which BCBSM instituted in the late 1970s and early 1980s. Those cost containment techniques are the Predetermination Program and the lowering of screens for frequently performed surgical techniques on feet.

### A. *Predetermination Program*

The Predetermination Program was implemented on September 15, 1981. It was initially developed after Chrysler and the UAW agreed in 1979 to develop a predetermination program to reduce the amount of money paid for high cost medical procedures. Included as cost containment targets were high volume foot and ankle surgery procedures. Chrysler–UAW 1979 Collective Bargaining Agreement at 240–41.

Predetermination was developed to reduce the amount of unnecessary foot surgery which was performed by health care providers and reimbursed by insurers and thus to reduce Chrysler Corporation health care costs.[2]

The Predetermination Program was developed by the BCBSM Health Care Cost Committee. This committee was composed of members of the BCBSM Board of Directors[3] and members of the BCBSM Corporate Body.[4] At the points in time which are relevant to this case, the committee varied in size from eleven to fourteen members. The membership was largely composed of consumer representatives, although there was 1 MD, or sometimes 2 MDs, on the Health Care Cost Committee. Under the BCBSM bylaws, the Health Care Cost committee had no authority to establish policy. Rather, the Committee's suggestions had to be approved by the Board of Directors.

Implementation of the Predetermination Program was accomplished by the BCBSM Health Care Affairs Department. This department was composed entirely of BCBSM employees during the times pertinent to this lawsuit. Additionally, although this department was headed by two different vice presidents during the pertinent periods, neither of these vice presidents was a provider of health care services. The Health Care Affairs Department was responsible for implementing the plans approved by the BCBSM board members.

The BCBSM cost containment programs were discussed by regional cost contain-

---

**2.** Chrysler Corporation was cognizant of the high costs of foot surgery and began discussing this cost problem with MSPA as early as 1975. The minutes of these discussions reveal that a large part of the problem was admittedly due to certain podiatrists' abuse of third party insurer reimbursement systems. Hence, Chrysler asked BCBSM to design a predetermination program which would correct the problem of high utilization of foot surgery. Notably, a study done by BCBSM of the 50 types of surgery for which BCBSM most frequently reimbursed health care providers in 1979 revealed that, of the top 25, 19 were procedures which were mainly performed by podiatrists.

**3.** The Board of Directors of BCBSM is the body which has overall decision-making authority for BCBSM. During the time period relevant to this case, the BCBSM Board had 47 members. Of these members, 27 were consumer representatives, 19 were provider representatives, and 1 was the President of BCBSM. The provider representatives included 9 physicians, of whom 7 were MDs.

**4.** The BCBSM Corporate Body is the group which selects the Board of Directors from its membership. During the relevant time period, the Corporate Body was composed of 90 persons, 54 of which were consumer representatives and 14 of whom were MDs.

ment committees established by BCBSM. These committees were formed in 1980 as forums for BCBSM discussions with providers. They lacked any policy-making authority. Notably, these regional committees had consumer majorities, being composed of four consumers and independents, two MDs, and one DO.[5] Deposition testimony has established that podiatrists were excluded from the regional cost containment committees.

Finally, it is apparent that there was one BCBSM committee which had an MD majority during the pertinent times. This committee is the Professional Relations Committee. However, the MDs who dominated this committee were members of either the BCBSM Board of Directors or the BCBSM corporate body. Under the BCBSM bylaws, this committee served an advisory role. It was instilled as a communications link between BCBSM and health care professionals, and had no apparent decision-making authority. There is no indication that this committee had any input into cost containment procedures.

### B. *Lowering of Screens*

The screens which are pertinent to the present case are those instituted in 1978, 1980, and 1983.[6] In those years, BCBSM reduced the amount it paid health care providers for certain procedures. The screen changes were enacted by the BCBSM Board of Directors. Notably, the 1983 screen changes were relative value screens. Under those screens, procedures requiring more complexity, skill, time, and resources are given a higher relative value than those procedures which are not as complex or resource-consuming. These rel-

ative values are considered in establishing maximum screens. In the present lawsuit, the screen changes complained of are those applicable to all health care providers who provide foot care services. It is agreed by all parties that the lowering of those screens reduced the reimbursement made by BCBSM to podiatrists.

### C. *Class Certification and Consolidation*

The class involved in this case was certified by the Court's Order of May 30, 1986 entered in Case No. 85–1075. That order certified as the class action thirteen separate cases raised by individual podiatrists which had been filed in 1985. The certified class action was consolidated with the MSPA lawsuit by the Court's Order of December 10, 1986. Although consolidation occurred, the two complaints filed, one by the class and one by MSPA, remain viable. These complaints are the First Amended Complaint filed by the class and MSPA's Second Amended Complaint. Only Counts I and III of each complaint remain to be decided.[7] These counts, for all intents and purposes, are the same. The only differences between the two complaints is that evidence of the 1978, 1980, and 1983 screen reductions is admissible in the MSPA case, while only those screen reductions which occurred in 1983 are admissible in the class action. The December 10, 1986 Memorandum Opinion indicated that the Court would consider giving cautionary instructions regarding the various screen reductions at trial should such instructions prove to be necessary.

### II. *Summary Judgment Standard*

Summary judgment in civil antitrust cases is, of course, governed by Fed.R.

---

5. The composition of the regional cost containment committees established by BCBSM was at variance with that suggested by the MSMS Physician Liaison Committee. The Committee had recommended that the regional committees be composed of three MDs, one DO, and two consumers appointed by BCBSM. This suggestion was rejected by BCBSM.

6. The Memorandum Opinion and Order issued in this case on March 20, 1986 indicated that the class could not include those podiatrists who practiced in Michigan from 1978 to October 8, 1983 as to the screen reductions. Memorandum Opinion and Order at 7. Thus, the class mem-

bers only have an action for the screen reductions occurring on October 9, 1983. Although the Court reversed its ruling denying class certification to the class on that date, its later decision to grant class certification did not disturb its conclusion as to which screen reductions were applicable to the class.

7. The Court's Memorandum Opinion and Order of March 20, 1986 dismissed Count II of the class complaint. *See Harper v. BCBSM, et al.,* No. 85–1567, et seq. (E.D.Mich. March 20, 1986) (order denying class certification).

Civ.P. 56(c). *See Daily Press, Inc. v. United Press International,* 412 F.2d 126 (6th Cir.1969). Thus, when there is "no genuine issue as to any material fact and ... the moving party is entitled to summary judgment as a matter law," summary judgment may be granted for the moving party.

] It has been stated by many courts, including the Supreme Court, that summary judgment should be used sparingly in antitrust cases. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942 (6th Cir.1983); *Ratino v. Medical Service of Dist. of Columbia (Blue Shield),* 718 F.2d 1260 (4th Cir.1983). And, summary judgment should not be granted in an antitrust case where discovery has not been completed. *Glen Eden Hospital v. Blue Cross & Blue Shield of Michigan,* 740 F.2d 423 (6th Cir. 1984). However, this does not mean that summary judgment should not be granted in an appropriate antitrust case. As stated by the Supreme Court,

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full dress trial not withstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968). *See* II P. Areeda & D. Turner, *Antitrust Law* para. 316 (1978). To survive a defendant's motion for summary judgment in an antitrust case, the plaintiff must provide the court with some factual basis from which the requisite elements of intent and conspiracy can reasonably be inferred. *Id.* at 290, 88 S.Ct. at 1593; *Potters Medical Center v. City Hospital Ass'n,* 800 F.2d 568 (6th Cir.1986).

Additionally, as stated in Fed.R.Civ.P. 56(e),

When a motion for summary judgment is made and supported as provided in this rule, as adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

As established by the Supreme Court in *Cities Service,* Rule 56(e) retains full effect in antitrust cases. 391 U.S. at 290–91, 88 S.Ct. at 1593. *See also Glen Eden Hospital,* 740 F.2d at 427. Thus, when the moving party identifies the parts of the pleadings, the affidavits, and the discovery materials which it feels demonstrates that there is no genuine issue of material fact, the nonmoving party must go beyond the pleadings and demonstrate to the court that there are specific facts which indicate that there is a genuine issue for trial. *Potter Medical Center,* 800 F.2d at 572; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because this is a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 553; *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Additionally, the nonmoving party must be given the benefit of all reasonable inferences. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319 (6th Cir.1983). These standards shall be utilized in deciding the present motion.

### III. *The Sherman Act*

The complaints in the present case allege that violations of Section 1 of the Sherman Act, 15 U.S.C. Sections 1–7, occurred. Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is declared to be illegal." [8] The Supreme Court has held that, regardless of the specific practice being challenged, three elements must be proven to establish a violation of Section 1 of the Sherman Act. Those elements are:

(1) a contract, combination, or conspiracy among two or more persons;

(2) an unreasonable restraint of trade due to the contract, combination, or conspiracy; and

(3) an effect of the unreasonable restraint on interstate or foreign commerce.

*United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Unless it is demonstrated that these three elements exist, there has been no violation of Section 1.

### A. Contract, Combination, or Conspiracy

■ For antitrust purposes, the terms "contract," "combination," and "conspiracy" retain their normal common law connotations. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). As one of the prerequisites for establishing an antitrust violation under Section 1 of the Sherman Act, plaintiffs must be able to show that a conspiracy, contract, or combination existed. A conspiracy may be inferred from circumstantial evidence. This evidence must indicate that the alleged conspirators entered into an unlawful arrangement or understanding. *Monsanto v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); W. Holmes, *Antitrust Law Handbook* sec. 1.03 (1987).

■ However, the Supreme Court has drawn limits on the inferences which may be drawn from ambiguous evidence in anti-

trust cases. In antitrust cases, the Supreme Court has concluded that, absent evidence that tends to exclude the possibility that alleged conspirators acted independently, an inference of conspiracy may not be drawn where the conduct complained of is as consistent with permissible competition as with illegal conspiracy. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 553; *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470. Thus, an antitrust plaintiff responding to a defendant's motion for summary judgment must show that an inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action which could not have harmed the plaintiff. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 553. It is not enough that the responding party show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 552. Rather, an inference of conspiracy is only allowable when that inference is economically sensible. *Id.*, 475 U.S. at 594, 106 S.Ct. at 1360, 89 L.Ed. at 558.

■ To show that a conspiracy, contract, or combination exists, plaintiffs must prove that two elements exist. Those elements are:

(1) a plurality of actors, and

(2) concerted action by the plurality of actors.

■ In general, it is not difficult to tell when a plurality of actors exists. Some problems do arise, however, when there is an alleged intracorporate conspiracy. The general rule in intracorporate cases is that officials or employees of the same firm do not provide the plurality of actors imperative for a Section 1 conspiracy. *Cooperweld v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). Nevertheless, an exception to

---

**8.** The Sherman Act is criminal in character when the Department of Justice prosecutes the lawsuit. When private parties such as the present plaintiffs pursue a Section 1 lawsuit, those parties may seek equitable relief under Sections 15 and 16 of the Clayton Act, 15 U.S.C. secs. 12–27. A private party may also seek damages for violations of Section 1 of the Sherman Act. Pursuant to Section 4 of the Clayton Act, the damages which *shall* be awarded are treble the damages sustained plus the cost of the lawsuit. The costs of the lawsuit statutorily include a reasonable attorney's fee. The plaintiffs in the present case seek both injunctive relief and treble damages.

this rule is made when the corporate directors, officers, or representatives are working on behalf of two or more entities. If such a relationship can be shown, a conspiracy between those entities may be found to exist. *See Green v. Associated Milk Producers, Inc.,* 692 F.2d 1153, 1156 (8th Cir.1982).

 It is much more difficult to determine whether concerted action has occurred. "Concerted action" is defined as a consensus or agreement by the parties to act together. *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Such a consensus need not be express or even direct. Rather, concerted action may be inferred by the trier of fact from circumstantial evidence such as the words and conduct of the parties. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). However, when an antitrust plaintiff is relying on circumstantial evidence to show that a conspiracy occurred, the question of whether engaging in the conspiracy makes economic sense for the defendant must be considered by the court. *Matsushita,* 475 U.S. at 574, 106 S.Ct. at 1355, 89 L.Ed.2d at 552. Conduct which is as consistent with permissible competition as with illegal conspiracy does not support the inference that an antitrust conspiracy has occurred. *Id.,* 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 553. And, if the suggested anticompetitive conduct is economically implausible, there can be no inference of conspiracy. *Id.*

 For the unity of action required by Section 1 of the Sherman Act to exist, the parties must intend to combine or conspire in restraint of trade. In civil cases, the intent required is only a general intent. *General Motors Corp., supra.* General intent may be shown by establishing that each party acted with the intention that his acts would have their ultimate consequences, and with the knowledge that another party would act in conjunction with him. *Interstate Circuit v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406, *reh'g denied,* 387 U.S. 949, 87 S.Ct. 2071, 18 L.Ed.2d 1340 (1967). The requisite knowledge will be implied if there are facts indicating that the parties should have known concerted action was contemplated.

 The plaintiffs allege that there is a conspiracy in the present case. They allege that MSMS and BCBSM formed this conspiracy with the purpose of damaging podiatrists. Although the Court reaches no conclusions as to whether any antitrust exemptions apply in the present case, it shall discuss the merits of the plaintiffs' claims under the assumption that no exemptions apply. Thus, BCBSM's activities shall be analyzed under antitrust concepts. *See Ratino,* 718 F.2d at 1268 (4th Cir.1983). The bases which the plaintiffs have for their assertions include:

(1) the May 7, 1978 agreement between BCBSM and MSMS to work together to develop a cost containment program;

(2) the May 3, 1978 memorandum to the BCBSM Board of Directors regarding the agreement between BCBSM and MSMS to pursue discussions aimed at resolving disputes over the then-current physician reimbursement policy;

(3) the fact that MDs have the largest representation by any physician group on the BCBSM Board;

(4) the May 13, 1980 interoffice memorandum to Ann Simpson from Richard Donovan, a BCBSM employee who was an MD, which stated that 2 codes should be deleted from the Predetermination Program "since the Medical Practice Act excludes amputation of the feet from the scope of Podiatric practice";

(5) the fact that no podiatrists were on the Regional Cost Containment Committees which discussed cost containment procedures;

(6) the August 8, 1978 letter to Louis Zako of MSMS by Louis Hayes of BCBSM regarding the 1979 Automakers/UAW negotiations in which Dr.

Hayes describes BCBSM as "acting as agents for MSMS";

(7) the July 25, 1978 letter from Dr. Zako of MSMS to BCBSM President John McCabe which states that "MSMS is aware that BCBSM field staff is independently contacting county medical societies and hospital staffs" concerning items which are deemed to warrant consideration at the 1979 Automaker/UAW negotiations;

(8) Joseph Califano's book which states that "Blue Cross and Blue Shield were captives of the doctors and hospitals through State and local medical societies and the dominance of the boards of directors of the Blues";

(9) the "traditional dominance" of BCBSM by MDs;

(10) MDs had significant influence on BCBSM policy;

(11) MSMS was found to have violated the antitrust laws by boycotting BCBSM in the late 1970s; and

(12) The 1973 Fall Session Council of the MSMS House of Delegates lists four Blue Shield board members and three former Blue Shield board members as council members and describes the Council–Blue Shield relationship as "slightly 'incestuous'."

On review of the evidence presented by the plaintiffs, it is apparent that plaintiffs have failed to establish the existence of a conspiracy. The Court concludes that plaintiffs' theories of plurality and concerted action are unsupported by the evidence. In essence, the plaintiffs are suggesting that a structural horizontal conspiracy existed between BCBSM and MSMS. The plaintiffs have postulated such a relationship based largely on the "historical domi-

nation" of BCBSM by MDs and on the presence of MDs on the BCBSM board and corporate body. However, plaintiffs have submitted no evidence that would indicate that the MDs who were on the Board of Directors at BCBSM were acting for MSMS at the times relevant to this case. The composition of the 1973 MSMS Council is inapposite to this conclusion, as 1973 is not within the appropriate time period. Nor is the historical backgrounds of BCBSM's constituent corporations relevant to BCBSM's own structure.[9] The Court finds plaintiffs' "historical dominance" argument to be immaterial to the present case. The statements in Mr. Califano's book do not alter the Court's conclusion,[10] as Mr. Califano testified at his deposition that he had no specific knowledge of BCBSM when he wrote his book. Accordingly, the Court finds that the plaintiffs have not established a genuine issue as to any material fact with their historical dominance argument.

After a thorough examination of the facts material to the relevant time periods in this case, it is clear that plaintiffs have not established that the MDs on the BCBSM board and corporate board were working for MSMS. The plaintiffs apparently ask the Court to infer that, by virtue of their status as MDs, these board members were acting for MSMS during the relevant period. The Court concludes that the fact that a number of board members and corporate body members were MDs is not of itself sufficient to show that those persons were acting for MSMS. Rather, plaintiffs must show some connection between MSMS and the BCBSM decision-making bodies during the times relevant to this case. Absent such a showing, it will be determined that BCBSM acted unilater-

---

**9.** Notably, the structure of the "Blues" in Michigan underwent great changes in 1975. In that year, the Michigan Hospital Service and Blue Shield submitted a joint plan of consolidation to Daniel Demlow, then the Insurance Commissioner of Michigan. This plan was approved on January 23, 1975. The corporation consolidated under the plan was Blue Cross and Blue Shield of Michigan. Under the plan, the board of directors and the corporate membership had a composition which was very different from that of the predecessor corporations. Addition-

ally, the BCBSM bylaws established special committees to assist the BCBSM operations. Because of these huge alterations in the corporate structure, the historical structure of the predecessor corporations is of little importance to the present case.

**10.** J. Califano, Jr., *America's Health Care Revolution: Who Lives? Who Dies? Who Pays?* (1986).

ally to institute predetermination and the screen changes. And, if BCBSM acted unilaterally, there has been no violation of Section 1 of the Sherman Act and summary judgment must be granted for BCBSM.

The plaintiffs suggest that MSMS and BCBSM were integrally connected, garnering support for their position from the presence of MDs on the BCBSM board and corporate body. Plaintiffs have identified one member of the BCBSM board who was also a delegate to the MSMS House of Delegates. That individual was Dr. Louis Hayes, an MD who retired from BCBSM in 1980. Plaintiffs have admitted that Dr. Hayes served as a liaison between BCBSM and MSMS.

The Supreme Court has recognized that communications between insurers and providers are necessary in order to make an insurance plan competitive. *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 353 and n. 28, 102 S.Ct. 2466, 2478 and n. 28, 73 L.Ed.2d 48 (1982). *See also Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir.1986). It has also recognized that "some type of provider arrangement is necessary for a service benefit plan to exist." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 213 and n. 9, 99 S.Ct. 1067, 1074 and n. 9, 59 L.Ed.2d 261 (1979). On the basis of these statements, the Court concludes that a certain amount of communication between BCBSM and MSMS is necessary. For an antitrust violation to result from communications between the insurer and the provider group, it must be shown that something beyond the necessary amount of communication occurred.

In the present case, plaintiffs have not alleged that Dr. Hayes or any other MD on the BCBSM board exerted undue influence on BCBSM to implement MSMS plans. The plaintiffs have neither alleged nor shown that the communications between BCBSM and MSMS resulting from Dr. Hayes' presence on the MSMS House of Delegates exceeded the bounds of propriety. Absent such a showing, the Court concludes that there was no impropriety. Thus, the Court concludes that Dr. Hayes'

positions with BCBSM and MSMS do not support the existence of the alleged antitrust violations.

The Court further concludes that the MD members of the BCBSM governing bodies did not have control of the BCBSM decision-making process. As noted above, in the period of time relevant to this case, there were 7 MDs on the 47 member BCBSM Board of Directors, 14 MDs in the 90 member BCBSM Corporate Body, and 1 to 2 MDs on the 14 member Health Care Cost Committee. Thus, the percentage representation of MDs in these various BCBSM bodies was, respectively, 15%; 16%; and either 7 or 14%. These statistics, contrary to the plaintiffs' assertions, simply do not suggest that MDs dominated BCBSM. Rather, this level of representation too low to indicate MD control of the BCBSM board. *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania,* 745 F.2d 248 (3d Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985) (where two members of a thirty-two member board were dentists, dentists did not control the Blue Shield board).

Under the BCBSM bylaws, the membership of the corporate body was 94 persons, 29 of whom represented substantial group purchaser consumers, 10 of whom represented labor union consumers, 12 of whom represented other consumers, 4 consumers appointed by the Commissioner of Insurance, 14 MDs, 4 DOs, 18 representatives of hospitals, 2 pharmacists, the BCBSM chairman of the board, and the BCBSM president. Each of the component groups selected their own representatives. Thus, under the bylaws, 57% of the corporate body members represented consumers.

The BCBSM Board of Directors consisted of 48 members, 14 from substantial group purchasers, 5 from labor unions, 6 consumer representatives, 2 consumers appointed by the Insurance Commissioner, 7 MDs, 2 DOs, 9 hospital representatives, one pharmacist, the chairman of the board, and the BCBSM president. These persons served three year terms. Nominees to the board were provided by the component groups

and were elected by the corporate body as a whole.

As the component groups selected their own representatives for the BCBSM corporate body, there is no suggestion that MDs dominated that entity. *Cf. Addino v. Genessee Valley Medical Care*, 593 F.Supp. 892 (W.D.N.Y.1984) (where non-medical members of the board of a Blue Shield plan were selected by a nominating committee with an MD majority, the board was effectively dominated by MDs). Additionally, as the board of directors has a set group composition selected from the members of the corporate body, there is no indication of MD domination of the BCBSM board. Although there is one committee within BCBSM which has an MD majority, the Court concludes that the composition of the Professional Relations Committee is immaterial to the present action. As set forth earlier, this committee lacked any decision-making authority. Absent such authority, the composition of the Professional Relations Committee is of no relevance to this case. *Barry*, 805 F.2d at 868–69.

Finally, the inclusion of MDs in BCBSM corporate bodies and the lack of podiatrists in those same bodies should come as no surprise in light of the fact that 95% of the physicians in Michigan are MDs and DOs. The Court finds that this fact on its own does not indicate that there was collusion between MDs and BCBSM. Thus, the Court concludes that the plaintiffs' evocation of a "structural conspiracy" is unsupported by the facts.

Plaintiffs' theory of conspiracy lacks merit on other grounds as well. Plaintiffs rely on incidents which, after careful study, the Court finds to be ambiguous at best. For example, the plaintiffs suggest that the FTC's conclusion that MSMS was boycotting BCBSM indicates that a conspiracy existed between MSMS and BCBSM. *See In re Michigan State Medical Society*, 101 F.T.C. 191 (1983). The boycott resulted in BCBSM instituting state-wide screens in 1978 which paid all Michigan health care providers the screen rates which previously were paid to physicians in the state's highest paying region. The plaintiffs contend that these increases in screen rates indicate conspiracy between MSMS and BCBSM because podiatrists' screens were lowered at the same time the higher screens were instituted for other procedures.

However, among other holdings, the FTC concluded that MSMS's boycott impeded BCBSM's efforts to compete with other insurers by containing costs and providing full service benefits. 101 F.T.C. at 282. In light of the damage which the boycott did to BCBSM's competitive stance, the conspiracy postulated by the plaintiffs is economically implausible. As discussed by the Supreme Court in *Matsushita*,

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

475 U.S. at 596–97, 106 S.Ct. at 1361. 89 L.Ed.2d at 558–59.

In the present case, BCBSM had no rational economic motive to conspire with MSMS. Additionally, BCBSM's institution of state-wide screens is as consistent with a unilateral attempt by BCBSM to keep providers participating in the BCBSM plan as it is with a conspiracy between BCBSM and MSMS.[11] Thus, the MSMS boycott of BCBSM and the resulting institution of state-wide screens do not give rise to an inference of conspiracy between BCBSM and MSMS.

Further, even had the Court determined that a conspiracy existed between BCBSM and MSMS as to the state-wide screens, it cannot be inferred that the alleged conspiracy extended to an attempt to boycott the podiatrists. Rather, it must be shown that BCBSM and MSMS conspired to injure the

---

11. At the time of the FTC decision, over 80% of the medical doctors in Michigan were MSMS

members. *In re Michigan State Medical Society*, 101 F.T.C. at 196, 265.

podiatrists. Two of the agreements cited by the plaintiffs as evidence of a conspiracy between MSMS and BCBSM were agreements reached pursuant to the MSMS boycott of BCBSM. These are the May 3, 1978 and May 7, 1978 agreements. Since the Court has concluded that the MSMS boycott of BCBSM does not give rise to an inference of conspiracy between MSMS and BCBSM, it likewise concludes that these agreements also are not indicative of a conspiracy.

Another item which the plaintiffs contend supports their theory of conspiracy is the 1979 letter written by Dr. Hayes of BCBSM to Louis Zako of MSMS. Although the letter clearly describes BCBSM as "acting as agents for MSMS," on review of the letter in its entirety, it is apparent that BCBSM was acting as a courier of information from MSMS to the 1979 Automaker/UAW negotiations. And, after review of other documents and affidavits presented to the Court, it is clear that other physician groups, including the podiatrists and osteopaths, used BCBSM in a similar fashion. In the letter to MSMS, Dr. Hayes of BCBSM carefully explained BCBSM's role in the negotiations. As he stated, BCBSM was not invited to the bargaining table, but merely provided input in advance and on request. Viewed in the light most favorable to the plaintiffs, this letter presents evidence of ambiguous conduct which does not support the inference that an antitrust conspiracy existed. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 553. In light of the ambiguous role which BCBSM played at the 1979 negotiations, conspiracy is not indicated by the fact that BCBSM consulted various state medical societies and hospital staffs regarding items which those entities might want placed before the negotiators. Also, as noted above, such communications between insurers and providers are necessary to ensure the competitiveness of an insurance plan. *Maricopa County, supra; Barry, supra.*

The Court also concludes that, absent evidence showing that Dr. Richard Donovan was acting for both MSMS and BCBSM, the memorandum he wrote to Ann Simpson on May 13, 1980 does not indicate the existence of a conspiracy. As noted earlier, a plurality of actors cannot exist in an intracorporate structure absent a showing that an employee was working on behalf of two or more entities. *See Cooperweld, supra.* The plaintiffs have not submitted any evidence which establishes that Dr. Donovan was indeed working for both BCBSM and MSMS. They have alleged nothing more than that Dr. Donovan was an MD. Thus, under Rule 56(e), no genuine issue of material fact exists as to the memorandum.

The Court concludes that the plaintiffs have not met the burden imposed on them by Fed.R.Civ. 56(e) and *Matsushita*. That is, they have not "set forth specific facts showing that there is a genuine issue for trial" on the conspiracy issue as to either the screens or the Predetermination Program. Accordingly, summary judgment must be granted for BCBSM.

### B. *Restraint of Trade*

In order to succeed in the present case, the plaintiffs must also show that the BCBSM actions of which they complain are intended to be covered by the antitrust laws. That is, they must show that there was a restraint of trade which constituted an antitrust injury. *Brunswick v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In antitrust law, "restraint of trade" essentially means restraint of competition. *United States v. Eastern States Retail Lumber Dealers' Ass'n*, 201 F. 581 (D.C.N.Y.1912), aff'd, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). To demonstrate an antitrust injury, the plaintiffs must show that there is an injury to *competition*. Whether there has been an injury to a competitor is irrelevant, for the antitrust laws were enacted "for the protection of competition, not competitors." *Cargill v. Monfort of Colorado, Inc.*, 479 U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

On review of the affidavits and other supporting materials filed with the Court, it is clear that the plaintiffs have failed to establish a genuine issue of fact

as to the existence of an antitrust injury. The complained-of behavior in the instant case is the institution of the Predetermination Program and the lowering of screens applicable to podiatric procedures. To show that these occurrences resulted in an antitrust injury, the plaintiffs must show that there was an injury to their competitive stance. However, the depositions of the podiatrists taken in this case indicate that podiatrists lost no patients due to the BCBSM cost containment procedures. As plaintiffs' expert, Dr. Thomas McCarthy, has stated, plaintiffs compete for the market of foot care patients. Since plaintiffs compete for foot care patients, their failure to demonstrate a change in their competitive stance in that market indicates that there is no genuine issue as to whether they suffered an antitrust injury.

Similarly, Dr. McCarthy admitted in his deposition that the same BCBSM screens were applied to all physicians performing the same foot surgery procedures. Although the plaintiffs contend that MDs were able to evade the screens by deceptive business practices, plaintiffs' counsel admitted during oral argument that the statistical evidence produced by Dr. McCarthy suggesting evasion was misleading. In light of counsel's comments, plaintiffs have not demonstrated that there is a genuine issue regarding screen evasion by MDs. And, since all physicians doing the same foot surgeries were subject to the same screens, the podiatrists were not subjected to unequal or unfair terms. *Cf. St. Bernard General Hospital v. Hospital Service Ass'n,* 712 F.2d 978 (5th Cir.1983) (refusal to deal on fair and equal terms can be a prohibited refusal to deal under Section 1 of the Sherman Act). Absent a showing of inequities in the BCBSM screens, the podiatrists have not established that an antitrust injury resulted from those screens. Without such an injury, there has been no violation of Section 1 of the Sherman Act.

The plaintiffs' arguments that they compete for "a slice of the BCBSM pie" are without merit. Reduced down to its essentials, this argument merely is that podiatrists make less money from BCBSM than previously. Such a claim is insufficient to state an antitrust violation. *Brillhart v. Mutual Medical Insurance Co.,* 768 F.2d 196 (7th Cir.1985); *Sausalito Pharmacy v. Blue Shield,* 544 F.Supp. 230 (N.D.Cal. 1981). Further, the slice of the pie argument is based on mistaken notions of BCBSM's role in the health care market. BCBSM competes for subscribers with other insurers. Like other insurers, it purchases health care services for its subscribers from health care providers. *See Brillhart,* 768 F.2d at 199; *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984). If BCBSM's subscribers at some point utilize podiatrists' services, those podiatrists will be reimbursed by BCBSM. Absent a situation where a podiatrist's patient is also a BCBSM subscriber, the podiatrist will receive no reimbursement from BCBSM. Since the insurance company from which the podiatrists receive compensation is dependent on the insurer the patient picks, the podiatrists have no inherent right to any set percentage of reimbursement from BCBSM.

Additionally, changes in technology, in relative difficulty of surgical procedures, in resources utilized in the procedures, and in educational requirements for various physician groups dictate changes in the insurers' reimbursement rates. Such screen changes will undoubtedly affect the relative percentages of total BCBSM reimbursement which various physician groups receive. These changes, without more, do not indicate that an antitrust injury has occurred. Further, an insurer's unilateral changes in screen levels are not a violation of antitrust laws absent provider control of the insurer. *See Maricopa County, supra.* Such changes may well be required to keep the rising costs of health care down. As noted by one commentator, "[A] peculiar feature of the health care market is the absence of incentives for consumers or providers to control the amount and the price of services rendered.... [I]t is the health care insurer who is in the best position to control the cost of health care." 6 J. Von Kalinowski, *Antitrust Laws and Trade Regulation* sec. 52.04[2] (1986). As keeping the costs of health care down is a

legitimate pursuit of insurers, the lowering of screens or the requirement that predetermination be used standing alone does not indicate that an antitrust injury has occurred. Thus, although the plaintiffs ask the Court to infer an antitrust injury from their changing slice of the BCBSM pie, the Court concludes that the size of the pie slice is not probative of whether an antitrust injury occurred.

Further, the facts furnish no support for the antitrust theories relied on by the plaintiffs. In the complaints, it is alleged that the Predetermination Program constituted a horizontal boycott against the podiatrists. It is further alleged that the reduction of screens on foot surgery procedures constituted price fixing. These two categories of anticompetitive behavior have previously been determined by the Supreme Court to be *per se* illegal. *See Maricopa County, supra; Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). However, the Supreme Court has stated that business relationships should only be classified as *per se* violations of the Sherman Act after the courts have had considerable experience with them. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

In the present case, the Court finds it unnecessary to address whether the activities complained of in the present case constitute *per se* antitrust violations.[12] For, after review of the alleged anticompetitive behavior, it is apparent that the plaintiffs' theories are unsupported. Although the plaintiffs have postulated that they were the victims of a horizontal boycott, a horizontal boycott could only occur if plaintiffs were boycotted by a competitor. Since BCBSM is not a competitor of MSPA, there is no horizontal boycott in the present case. *See Royal Drug Co. v. Group Life and Health Insurance Co.,* 737 F.2d 1433 (5th

Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985). Additionally, as noted earlier, plaintiffs have not shown that MSMS controlled BCBSM. Thus, plaintiffs' horizontal boycott theory is without merit.

The price fixing theory espoused by the plaintiffs is similarly meritless. The plaintiffs have not established that there were different screen levels for the same procedure depending on the type of physician performing the procedure. Rather, their expert testified that he had no evidence that the screen levels differed for MDs and podiatrists. In the absence of evidence which indicates a difference in BCBSM's treatment of MDs and podiatrists, the defendant is entitled to summary judgment as a matter of law on the plaintiffs' price fixing theory.

Due to the failure of the plaintiffs to establish the existence of an antitrust injury or an illegal restraint of trade, BCBSM is entitled to summary judgment on this issue as matter of law.

C. *Effect on Interstate Commerce*

The term "effect on interstate commerce" is jurisdictional in antitrust cases. That is, there must be a restraint on commerce which affects an interstate part of a business before Section 1 is violated. The effect must be on an interstate part of a business; it cannot merely affect a business which happens to be engaged in interstate commerce. *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n,* 484 F.2d 751 (7th Cir.1973), *cert. denied,* 414 U.S. 1131, 94 S.Ct. 162, 42 L.Ed.2d 133, *reh'g denied,* 419 U.S. 887, 95 S.Ct. 162, 42 L.Ed.2d 133 (1974). Absent such an act, the court has no jurisdiction to hear the case. *McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

To indicate that there is an "effect on interstate commerce," the plaintiffs must

12. The majority of courts previously reaching this question have determined that a Rule of Reason analysis should be used. *See Brillhart v. Mutual Medical Insurance, Inc.,* 768 F.2d 196 (7th Cir.1985); *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania,* 745 F.2d 248 (3d Cir.1984); *Ratino v. Medical Service of the District of Columbia,* 718 F.2d 1260 (4th Cir.1983); *Royal Drug Co., Inc. v. Group Life and Health Insurance Co.,* 737 F.2d 1433 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985).

show that there is a demonstrable nexus of the complained-of activity with interstate commerce. The Supreme Court has developed two tests to determine whether such a nexus exists. These tests are:

(1) whether the activity is "in" commerce, and

(2) if an activity is local in nature, whether that activity "affects" commerce.

See 1 J. Von Kalinowski, *Antitrust Laws and Trade Regulation*, sec. 4.03[1] (1986 and Supp.1987).

 The "in" commerce tests is met if a restraint is placed directly on goods or services that are within the flow of inter-states commerce. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572, *reh'g denied*, 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975) (licensing of attorneys is in the flow of interstate commerce). If goods or services merely compete with items that are in interstate commerce, there is only an indirect restraint. Under those circumstances, the goods or services are not in the flow of interstate commerce.

If there is an indirect restraint, that restraint may still have an effect on interstate commerce. "As long as the restraint in question 'substantially and adversely' affects interstate commerce, the interstate nexus required for Sherman Act coverage is established." *Hospital Building Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *See also McLain, supra.*

 The plaintiffs need not make a particularized showing of an effect on interstate commerce caused by the alleged conspiracy. *McLain*, 444 U.S. at 242–43, 100 S.Ct. at 509. Rather, plaintiffs need only demonstrate a substantial effect on interstate commerce caused by the defendant's business activities. *Id.*

 In the instant case, it is far from clear that the requisite jurisdiction exists. Because subject matter jurisdiction is questionable in this case, the Court shall address it *sua sponte*. *See Stone v. William Beaumont Hospital*, 782 F.2d 609 (6th Cir. 1986). The plaintiffs have alleged that there is an effect in interstate commerce because:

(1) BCBSM pays out-of-state physicians for health care services rendered to BCBSM subscribers;

(2) BCBSM provides prepaid health care plans to cover the work force of virtually all Michigan manufacturers, such as Chrysler, whose products are sold in interstate and foreign commerce and which depend upon BCBSM's proper and legal administration of health care benefits for their workers;

(3) BCBSM administers, in large part, the federal Medicaid and Medicare programs which entail transfers of large amounts of out-of-state monies into the State of Michigan; and

(4) BCBSM draws resources from a national pool of health care funds available to prepaid health care plans and commercial insurance policies from within and without the State of Michigan.

Plaintiffs have also alleged in other pleadings that BCBSM's screen reductions and Predetermination Program had a direct effect on the statewide demand for podiatric services. Plaintiffs additionally allege that they purchase or prescribe a vast amount of supplies and equipment in interstate commerce.

It is not apparent that any of the effects cited by the plaintiffs are sufficient to confer subject matter jurisdiction on this Court. The requisites for such jurisdiction were set forth in *McLain*, 444 U.S. at 242, 100 S.Ct. at 509, which states:

Although the cases demonstrate the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction, a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted must proceed to demon-

strate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce. (Citations omitted.)

The Sixth Circuit has interpreted *McLain* to mean that "plaintiff[s] must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support an inference that defendants' activities infected by illegality either have or can reasonably be expected to have a not insubstantial effect on interstate commerce." *Stone*, 782 F.2d at 614. Thus, the Sixth Circuit requires a showing that the challenged activity itself has some impact on interstate commerce. *Sarin v. Samaritan Health Center*, 813 F.2d 755, 758 and n. 2 (6th Cir.1987). Inasmuch as plaintiffs have depended on BCBSM's overall business activities to provide the requisite nexus to interstate commerce, their arguments are without merit. *Id.* at 758 and n. 2.

In the present case, the plaintiffs must show that BCBSM's allegedly wrongful activities have "as a matter of practical economics ... a not insubstantial effect on interstate commerce." *McLain*, 444 U.S. at 246, 100 S.Ct. at 511. Such a demonstration has not been made. Plaintiffs have not shown that the Predetermination Program or the screen reductions have had a substantial effect on interstate commerce. The nexus with interstate commerce on which the plaintiffs rely is the fact that plaintiffs purchase supplies in interstate commerce.

Apparently, the plaintiffs would like the Court to infer that, due to changes in podiatrists' spending power resulting from the lowered screens and/or predetermination, the appropriate nexus with interstate commerce has been shown. As a matter of practical economics, lowering of screens and the establishment of predetermination do not result in a 'not insubstantial effect on interstate commerce.' In fact, uncontroverted affidavits establish that the complained-of BCBSM activities are wholly local in nature. Subscribers travelling out of Michigan are exempt from predetermination, as are patients who travel from out of state to see Michigan physicians. Additionally, BCBSM screens only apply to procedures performed on in state patients. Plaintiffs have not alleged sufficient facts concerning the alleged antitrust violations to support the inference that these activities do have a substantial effect on interstate commerce.

In light of plaintiffs' failure to establish the requisite effect on interstate commerce, the Court concludes that Section 1 jurisdiction has not been demonstrated.

As plaintiffs have not shown that any of the necessary elements for a Section 1 claim exist, the Court determines that defendant BCBSM is entitled to summary judgment as a matter of law. An appropriate order shall be entered. Since the Court has concluded that summary judgment should be granted for the defendant on the antitrust issues, BCBSM's collateral estoppel argument need not be reached.