**Dr. Donald J. BARRY and Dr. Bert Hassler, Plaintiffs-Appellants,**

v.

**BLUE CROSS OF CALIFORNIA, Defendant-Appellee.**

**No. 85–6448.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 5, 1986.

Decided Dec. 4, 1986.

---

Don Erik Franzen, Beverly Hills, Cal., for plaintiffs-appellants.

James Martin, Oakland, Cal., for defendant-appellee.

Before WALLACE, BOOCHEVER and KOZINSKI, Circuit Judges.

WALLACE, Circuit Judge:

Barry and Hassler, two California physicians, appeal from a summary judgment entered in favor of Blue Cross of California (Blue Cross). Their complaint alleges that Blue Cross participated in price-fixing and a group boycott in violation of federal antitrust law. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

Blue Cross, a nonprofit corporation, offers various forms of medical insurance to residents of California. By statute, at least two-thirds of the members of the Blue Cross governing board must be duly appointed representatives of the public, so that no more than one-third of the board's members can be physicians or representatives of hospitals with which Blue Cross has service contracts. Cal.Ins.Code § 11498 (West Supp.1986). In 1982, California enacted legislation authorizing private insurers to contract with hospitals and health care professionals to provide services for insureds at predetermined prices. Cal.Ins.Code § 10133 (West 1972 & Supp. 1986). Blue Cross decided to make such coverage available through an insurance package known as the Prudent Buyer Plan (the Plan).

Blue Cross contracted with physicians and hospitals to provide services at a fixed rate to those who subscribe to the Plan. If a subscriber receives treatment from one of these participating physicians, then Blue Cross pays for ninety percent of the cost of the service, once deductibles are satisfied. If a subscriber elects to use the services of a nonparticipating physician, Blue Cross pays only sixty to seventy percent of the physician's customary fee. Both subscribers and participating physicians are free to deal with any other patient, physician, or insurance company. A participating physician, however, cannot refer a patient insured under the Plan to a nonparticipating

physician without the consent of the patient.

Hassler contracted to provide services under the Plan; Barry declined to do so. Barry and Hassler (the two doctors) filed suit in the district court claiming that the Plan resulted in price-fixing and a group boycott in violation of the Sherman Antitrust Act of 1890, 15 U.S.C. (Sherman Act), section 1, and that Blue Cross is a monopolist in violation of Sherman Act, section 2. They also asserted various state law claims. After several months of discovery, the district court granted Blue Cross's motion for summary judgment on all federal claims and dismissed the pendent state law claims.

We review de novo whether the district court properly granted summary judgment. *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983). Viewing the evidence in the light most favorable to the two doctors, we must determine whether a genuine issue remains as to any material fact, and whether Blue Cross is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). We consider in turn each of the two doctors' three principal claims: horizontal price-fixing, unlawful vertical restraint of trade, and monopolization.

## II

The two doctors allege that the Plan represents a horizontal agreement among competing physicians. If so, the Plan is per se unlawful under section 1 of the Sherman Act because the Plan fixed prices for physician's services. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 356–57, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982) (*Maricopa*). To show a horizontal agreement, the two doctors rely on evidence that several thousand physicians signed identical contracts with Blue Cross and that physicians participated in creating the plan. Although their arguments are somewhat confused, we construe them to include two theories of horizontal agreement: (1) that the Plan enables its member physicians to fix prices in a manner similar to the arrangement that the

Court found unlawful in *Maricopa;* and (2) that the Plan resulted from conscious parallelism or a tacit conspiracy of physicians.

### A.

■ In *Maricopa*, physicians formed an organization to set maximum prices for physician services in Maricopa County, Arizona. 457 U.S. at 339, 341, 102 S.Ct. at 2470, 2471. Although Blue Cross is not an organization of physicians, the two doctors contend that summary judgment should be denied because they have produced sufficient evidence that physicians actually control the Plan.

First, the two doctors point to evidence that Blue Cross obtained advice on the Plan from various physician groups. The record indicates that Blue Cross wanted to test the reaction of physicians before putting the Plan into final form. Blue Cross solicited comments from several physician groups on a draft of the proposed agreement for participating physicians. The record contains two letters that Blue Cross received from the California Radiological Society expressing some complaints that radiologists had about the Plan. Blue Cross received both letters in July 1983, the same month that it began contracting with participating physicians. Thus, the letters conceivably could have influenced Blue Cross. The record also contains a letter from a physician dated December 1983, after the Plan was already in effect, expressing his opinions about the Plan. The record does not indicate that Blue Cross made any changes in the Plan as a result of this or any other information received from physicians. We conclude that this evidence does not permit an inference of physician control of Blue Cross or of the Plan. *Cf. Maricopa*, 457 U.S. at 353 n. 28, 102 S.Ct. at 2478 (commenting that an insurer must "canvass the doctors" to assure that the fee schedules of any new plan will be workable).

The two doctors also argue that physician control sufficient to invoke *Maricopa* can be inferred from the existence of a "Physicians Relations Committee" that re-

viewed both the plan and the fee schedules. The record contains a list of Blue Cross's "Advisory Boards, Committees, and Senior Staff" for 1984. This list indicates that the Physician Relations Committee consisted of sixteen doctors. The list includes several other advisory committees—including a consumer relations committee and a hospital relations committee—whose membership totaled sixty-one, none of whom were doctors. The list also indicates that the Blue Cross Northern California Board of Directors had nineteen members including four doctors, and that the Southern California Board had nineteen members, of whom only two were medical doctors and one was a doctor of public health. Finally, the list names the eleven senior executives for Blue Cross in 1984, none of whom was a doctor.

The record shows that Blue Cross asked the Physician Relations Committee to review the Plan and to offer "comments and suggestions" before the Plan was implemented in 1983. The record also indicates that the committee reviewed certain proposed fee increases in 1984. No evidence was presented that either review had any effect on the Plan. Furthermore, nothing in the record suggests that the committee had final authority over any aspect of the Plan. Indeed, the only direct evidence relevant to this issue, the declaration of a Blue Cross vice president, states unequivocally that all decisions regarding the Plan's terms and structure were made by Blue Cross's staff, not by physicians.

Although the physicians of California could have secretly agreed first to set prices and then to enforce them through Blue Cross's Physician Relations Committee, the two doctors have produced no evidence of such an agreement.

### B.

■ The other claimed theory of horizontal agreement involves the doctrine of conscious parallelism. Under that doctrine, a tacit agreement is shown if

[1] knowing that concerted action was contemplated and invited, the [physi-cians] gave their adherence to the scheme and participated in it. [2] Each [physician] was advised that the others were asked to participate; [and 3] each knew that cooperation was essential to successful operation of the plan.

*Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 710 (1939). The two doctors argue that because several thousand physicians all signed identical contracts, we should infer a tacit conspiracy among those physicians under the *Interstate Circuit* formula.

Conspiracy cannot be inferred from this evidence, however, because the last element of the *Interstate Circuit* test is not present. The two doctors have not shown that the physicians were economically interdependent—that "cooperation was essential to successful operation of the plan." *Id.* A showing of interdependence "is a *necessary* condition for inferring any conspiracy from parallelism." VI P. Areeda, *Antitrust Law* ¶ 1411, 71 (1986). Without interdependence, "each actor is indifferent to the others' behavior." *Id.* at 70.

■ The most precise test for economic interdependence involves an economic analysis of an industry's market structure. Economic interdependence exists only if an industry has relatively few competitors so that the actions of each has some impact on market price and thus on the conduct of competitors. *Id.* ¶ 1429a, 175. The two doctors have offered no evidence to show that such an oligopolistic market structure existed among physicians. Indeed, the record indicates that more than 20,000 physicians practiced in Los Angeles county alone. With such numbers, individual physicians could not possibly have had enough market power to influence the behavior of their rivals.

Although less precise than the examination of market structure method, we can also evaluate interdependence in a commonsense fashion by examining the relationship between alleged conspirators. We do so by asking several questions, all of which

have interdependence as their focus. *See id.* ¶¶ 1411–15 at 69–93.

First, we determine whether each of the physicians had an independent business reason for his conduct. *See Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1398 (9th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984); *cf. Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19–20 (9th Cir.1971). Here, each physician had a good independent reason for joining the Plan: each obtained access to Blue Cross customers. *See Maricopa*, 457 U.S. at 356 n. 33, 102 S.Ct. at 2478 n. 33 (observing the competitive advantage that a practitioner might gain by participating in a similar plan).

Second, we ask whether joining the Plan required a commitment contrary to the physicians' economic self-interest. *See Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 884 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Joining the Plan was not against a physician's self-interest. Each physician did agree to accept lower fees for providing services to Plan patients. But each physician was free to resign from the Plan at any time. If membership did not produce an improvement in total revenues, a physician had no obligation to continue participating in the Plan.

Finally, we determine whether an alleged conspirator would have benefited from having other physicians join the alleged conspiracy. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 287, 88 S.Ct. 1575, 1591, 20 L.Ed.2d 569 (1968) (*Arizona Bank*). It could be argued that at the inauguration of the Plan, participation by other physicians would be of benefit if it is assumed that a certain number of member physicians is necessary to make the Plan workable. Nevertheless, at least once the Plan was functioning, participating physicians did not benefit from having other physicians join. Each new physician that joined competed with the existing participants for the patronage of Plan subscribers.

Although other questions might also be asked, these are sufficient to dispose of this issue. Because the two doctors have not produced evidence that the physicians are interdependent, we cannot infer a tacit agreement.

Because the two doctors have not produced sufficient evidence of a horizontal agreement under any theory, summary judgment was proper on that issue. *See Brillhart v. Mutual Medical Insurance, Inc.*, 768 F.2d 196, 199 (7th Cir.1985) (*Brillhart*) (agreements between Blue Shield and participating doctors do not constitute a horizontal conspiracy); *Royal Drug Co. v. Group Life and Health Insurance Co.*, 737 F.2d 1433, 1437 (5th Cir.1984) (*Royal Drug II*) (evidence that pharmacies signed identical agreements to provide services to members of an insurance plan did not establish tacit conspiracy among the pharmacies), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985).

### III

The two doctors also allege a vertical conspiracy—between Blue Cross at one level and the physicians at another—to engage in unlawful restraints of trade. The two doctors argue that Blue Cross's conduct here is controlled by *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (*Colgate*), and the line of cases following it, and contend that, if the test of *Colgate* is met, we should conclude that Blue Cross's conduct was in violation of the Sherman Act. This argument, however, misconstrues the cases upon which it relies. *Colgate* relates only to the problem of inferring vertical agreements from conduct. Here, there is no such necessity. The record presents overwhelming evidence of vertical agreement: Blue Cross signed several thousand express agreements with physicians. However, we still must determine whether or not these express agreements restrain trade in violation of Sherman Act section 1.

■ We begin our analysis by determining whether the participating physician agreements fall into a class of activity that

has been condemned as per se unreasonable, or whether we should instead analyze them under the rule of reason. *Compare, e.g., Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (tying arrangements are unlawful per se); *with, e.g., Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977) (vertical nonprice market restrictions are to be judged under the rule of reason). We do not believe that the physician agreements are per se unreasonable. They do not in any obvious way constitute conduct within the traditional per se categories, and the two doctors have not suggested such a possibility.

The two doctors argue, however, that if we do apply the rule of reason instead of per se analysis, summary judgment is necessarily precluded. They contend that under the rule of reason test a court must undertake an elaborate examination of the practice in question, balance its procompetitive and anticompetitive effects, and determine whether a less restrictive alternative is available. Such an examination, they assert, ordinarily can take place only after a trial and extensive fact finding. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (*Poller*) (summary judgment should be used sparingly in complex antitrust litigation when "motive and intent play leading roles"). Therefore, they conclude, the district court should have denied the motion for summary judgment.

Not every practice, however, need be subjected to such an elaborate analysis. "The language [of *Poller*] merely teaches caution." *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir.1985) (*Barnes*). Occasionally, conduct is so clearly either reasonable or unreasonable that a court can dispose of the issue on summary judgment. *See Arizona Bank*, 391 U.S. at 290, 88 S.Ct. at 1593 (summary judgment is appropriate in an antitrust case in "the absence of any significant probative evidence tending to support the complaint"); *Barnes*, 759 F.2d at 680 (district court has

duty to grant summary judgment where antitrust plaintiff fails to present a record sufficient to find reasonably in his favor and there is no genuine issue of material fact). The rule of reason can be applied "in the twinkling of an eye." *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85, 109–10 n. 39, 104 S.Ct. 2948, 2965 n. 39, 82 L.Ed.2d 70 (1984); *see* VII P. Areeda, *Antitrust Law* ¶ 1508, 405–06 (1986). Close examination of the vertical agreements in this case reveals that they have no impermissible anticompetitive consequences, but do have procompetitive effects without a less restrictive alternative being available. Therefore the issue of their validity can be resolved without the need for trial.

First we consider whether the agreements have impermissible anticompetitive effects. The two doctors argue that the Plan has the consequence of boycotting or shutting out nonparticipating physicians by interfering with their access to patients insured by the Plan. We agree. However, every contract between a buyer and seller has precisely the effect of which the two doctors complain. When a buyer contracts with one seller, a second seller no longer has access to the buyer's business to the extent it is covered by the existing contract. This consequence, however, is not unlawful. *See Colgate*, 250 U.S. at 307, 39 S.Ct. at 468; *Brillhart*, 768 F.2d at 200; *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1292 (9th Cir.) (*Klamath-Lake*), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983). The two doctors have confused an agreement to boycott with an agreement to buy and sell services. *Cf. Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 214, 99 S.Ct. 1067, 1074, 59 L.Ed.2d 261 (1979) (*Royal Drug I*) (characterizing similar agreements as "arrangements for the purchase of goods and services by Blue Shield").

■ For a contract to have an impermissible anticompetitive effect, it must contain a provision that distorts transactions in an-

other market. For example, we condemn tying arrangements where a seller offers a product only on condition that a buyer purchase a second product as well, because the contract distorts the market for the second product. Similarly, we may condemn distributional restraints that affect a buyer's freedom to sell a product to a third party, or boycott agreements that affect a party's freedom to deal with a third party.

■ The two doctors claim that just such market distortion arises from the referral clause in Blue Cross's agreements with participating physicians. Under this clause, each physician "agree[d] to refer [patients insured by the Plan] to other [participating physicians] unless otherwise determined by [the referring physician] and agreed to by the [patient]." The clause does not deny a physician the right to refer patients to any person he chooses, whether participant in the Plan or nonparticipant. It does require physicians to notify patients if a referral is made to a nonparticipating physician.

The mere act of providing the information itself, as required under the referral clause, cannot be a cause of market distortion. The notification procedure is procompetitive rather than anticompetitive. One of the foundations of an ideal competitive market is the free flow of information to buyers and sellers. Without notification, a patient would not know that a referral physician did not participate in the Plan and hence that this physician's services were not covered as well. Notification under the referral clause, therefore, prevents "market failure" due to ignorance rather than causing market distortion.

However, the two doctors argue that we should consider the effect of this referral clause in light of the reduced benefits Blue Cross provides for treatment by a nonparticipating physician. Because of these reduced benefits, few patients will consent to treatment by a nonparticipating physician. Thus, the two doctors argue, the referral clause in effect implements a "refusal to deal."

We agree that paying lower benefits for treatment by nonparticipating physicians greatly discourages patients from using such physicians. This, however, is simply the ordinary consequence of every commercial contract, as previously pointed out. When a consumer contracts to buy services from one health plan, the consumer will then have little or no demand for the services of a nonparticipating physician, especially if the consumer would have to pay more for these services. The contract does not mean that the parties have agreed to an unlawful concerted refusal to deal. Under the Plan, a consumer still enjoys complete freedom to seek treatment from a nonparticipating physician; moreover, a Plan physician can refer any or all of his patients to a nonparticipating physician. Ordinary competitive market forces—lower prices—have simply reduced the demand for the nonparticipating physician's services. Nor does the system of reduced benefits for treatment by nonparticipating physicians represent an unlawful tying arrangement. The Plan does not require that the consumer purchase the services of any participating physician.

Therefore, although the vertical agreements in this case tend to foreclose nonparticipating physicians from doing business with patients insured under the Plan, the agreements do not cause impermissible market distortions. They do not prevent patients from seeing nonparticipating physicians, nor physicians from seeing nonsubscribing patients. Neither do they prevent participating physicians from referring patients to nonparticipating physicians, nor from contracting with other insurance companies. Therefore, the agreements do not have any prohibited anticompetitive effects.

On the other hand, the vertical agreements between Blue Cross and the physicians do have certain procompetitive consequences. By demanding lower prices from participating physicians, Blue Cross injects an element of competition into the market for physician services that otherwise might not be present. The Plan also requires

that physicians agree to utilization review—oversight by Blue Cross to see that physicians provide the proper kind and level of care. It therefore offers consumers the added choice of health care services subject to a sort of central "quality control." Blue Cross can only provide assured access to lower cost physicians and utilization review if it has physicians under contract. Therefore, the Plan, with its required vertical agreements with physicians, results in these added elements of competition.

Finally, the two doctors argue that a less restrictive alternative is available to Blue Cross. They suggest that, at the very least, Blue Cross should agree to reimburse policyholders for the services of nonparticipating physicians at the same rate as for participating physicians. But if Blue Cross did this, physicians would have a limited incentive to participate in the Plan because they would have access to Blue Cross subscribers without entering into an agreement. Such physician participation, however, is an essential element of the Plan. Therefore, the suggested less restrictive alternative is really no alternative at all.

Our conclusion here is supported by a number of decisions in which courts have reviewed and upheld health service plans similar to the one before us. In *Klamath-Lake*, 701 F.2d 1276, an insurer offered a prescription drug benefit available only through a single participating pharmacy. We held that this agreement did not constitute a boycott of pharmacies because the insureds remained free to purchase drugs from other pharmacies, although at higher prices. *Id.* at 1288; *see also Brillhart,* 768 F.2d at 200–01 (insurer's agreements with physicians to provide services at predetermined prices do not violate antitrust laws); *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922, 930–31 (1st Cir.1984) (same), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Royal Drug II,* 737 F.2d at 1438–39 (insurer who

pays reduced benefits for drugs purchased at nonparticipating pharmacies does not engage in boycott or unlawful vertical price fixing); *Proctor v. State Farm Mutual Automobile Insurance Co.,* 675 F.2d 308, 337–38 (D.C.Cir.) (agreements between insurer and repair shops to provide services to insureds at reduced rates do not violate antitrust laws in absence of unlawful horizontal agreement or conspiracy in restraint of trade), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230, 235–37 (N.D.Cal.1981) (insurer does not engage in unlawful vertical price-fixing by setting rate at which it will reimburse participating pharmacies), *aff'd per curiam,* 677 F.2d 47 (9th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982).

The agreement that the Fourth Circuit found unlawful in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476 (4th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), is distinguishable. In that case, Blue Shield reimbursed for psychologists' services only when billed through a member physician. Psychiatrists, who compete with psychologists, did not face this obstacle because, as medical doctors, they could simply become members of Blue Shield. By contrast, in the present case, Blue Cross does not discriminate against a particular class of medical provider, but instead is willing to purchase services from all physicians on equal terms. Furthermore, the defendant insurer in *Virginia Academy* was found to be controlled by physicians and thus a horizontal conspiracy existed. *Id.* at 480–81. Similarly, the other two cases that the two doctors cite as analogous to the present facts involved, at least in part, horizontal conspiracies between competitors. *See United States v. General Motors Corp.,* 384 U.S. 127, 140, 86 S.Ct. 1321, 1327, 16 L.Ed.2d 415 (1966); *St. Bernard General Hospital, Inc. v. Hospital Service Association,* 712 F.2d 978, 987 (5th Cir.1983).

## IV

The final claim of the two doctors is that Blue Cross has monopolized the market for medical insurance in violation of Sherman Act section 2. To prevail on this claim, they must establish that Blue Cross has a sufficiently large share of a relevant market. *See Transamerica Computer Co. v. International Business Machines Corp.*, 698 F.2d 1377, 1382 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). They have produced almost no data concerning Blue Cross's share of the market for medical insurance in California or in any region of California. The record does include a table of "Discharges by Expected Principal Payment Source" for Los Angeles Area Hospitals. This table somewhat overstates Blue Cross's market share by lumping its insureds together with those of another insurer, Blue Shield. Nonetheless, the table indicates that Blue Cross insured roughly eight percent of the discharged hospital patients. If we ignore those patients covered by Medicare, Medi-Cal, and self payment, Blue Cross insured sixteen percent of the remaining patients. Such a market share is far below what we would require for a monopoly. *See Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1058 (9th Cir.1982) (a thirty-five percent market share did not permit an inference of monopoly power), *cert. denied*, 471 U.S. 1130, 105 S.Ct. 2664, 86 L.Ed.2d 280 (1985). Therefore, summary judgment was appropriate on the issue of monopolization.

## V

Because the two doctors have not produced sufficient evidence of horizontal conspiracy, because the vertical agreements between Blue Cross and the participating physicians do not unreasonably restrain trade, and because they have produced insufficient evidence of monopoly power, we affirm the district court's judgment in favor of Blue Cross.

AFFIRMED.