J. ALLEN RAMEY, M.D., INC., Plaintiff,

v.

PACIFIC FOUNDATION FOR MEDICAL CARE, Defendant.

No. CIV 96–1738–B (RBB).

United States District Court,
S.D. California.

April 6, 1998.

Donald Merkin, San Diego, CA, for Plaintiff.

Rick C. Zimmerman, San Francisco, CA, for Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREWSTER, District Judge.

### I. Case Type and Jurisdiction

Plaintiff is suing Defendant under the Clayton Act for treble damages and injunctive relief for alleged violations of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has federal question jurisdiction over this action pursuant to 15 U.S.C. §§ 15, 26 and 28 U.S.C. § 1337. The parties have

submitted cross-motions for summary judgment.

On January 22, 1998, the Court requested that the parties submit additional briefing on the following question: "Has the Plaintiff suffered an 'antitrust injury' cognizable under § 4 and § 16 of the Clayton Act? See 15 U.S.C. §§ 15, 26; *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Atlantic Rich-field Co. v. USA Petroleum*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)."

## II. Background

Plaintiff J. Allen Ramey, M.D., Inc. ("Plaintiff") is a corporation owned by Dr. Ramey that offers ear, nose, and throat ("ENT") medical services in San Diego County.[1] Defendant Pacific Foundation for Medical Care ("Defendant" or "PFMC") is a non-profit, preferred provider organization (PPO) headquartered in Santa Rosa, California, that facilitates business between health care providers (i.e., doctors, hospitals) and third-party payors (i.e., insurance companies, health care service plans). Doctors may apply to Defendant to become preferred providers. Defendant selects preferred providers based upon their willingness to agree to provide medical services within certain reimbursement rate schedules and to abide by certain cost-containment quality of care and utilization controls.

Defendant's reimbursement rate schedule is established each year by an at least nominally independent actuary, Mr. Robert Shirrell. The actuarial process reviews industry data to establish a schedule of conversion factors that weigh the relative value of different types of services. These conversion factors are multiplied by prices for specific medical procedures, as established in the 1974 California Relative Value Studies, to determine the maximum price that will be reimbursed to preferred providers for services rendered to PFMC-affiliated patients.[2] Health care providers and third-party payors are permitted, and sometimes do, lobby Mr. Shirrell to adjust the schedule. Defendant's board of trustees does not vote on the schedule, and the schedule is not submitted to doctor-members for group approval. The schedules must be accepted or rejected on a yearly basis by each individual provider when they decide whether to renew their association with Defendant.

The quality of care and utilization control standards are established by Defendant's liaison committees for each of some thirty specialties. The otolaryngology liaison committee is composed of eleven to fifteen ENT specialists from practice locations throughout the country. These standards prescribe guidelines for testing, surgery, use of alternate techniques, etc. These standards are used to determine the appropriate billing codes to be charged to a patient, and are designed to protect payors from unnecessary and excessive procedures and overbilling.

A five-person membership committee reviews membership applications from the San Diego area in accordance with specified procedures. Fifty-six ENT specialists are listed in Defendant's 1997 San Diego County preferred provider directory. These doctor-members are free to join other PPO organizations. Several other PPOs operate in the San Diego area, and there is no evidence that Defendant is a dominant market actor in this area.

1. Dr. Ramey personally is not a party to this case. In fact, on November 10, 1997, California revoked Dr. Ramey's medical license for gross negligence in his treatment of a patient, although revocation was stayed and Ramey was placed on probation for a term of two years. At the same time, the report noted that Dr. Ramey had practiced for twenty-six years without any disciplinary action having been taken against him, and that he was a competent and caring physician. Because Plaintiff's counsel has continued to prosecute this lawsuit, the Court infers that Dr. Ramey's practice continues to operate, and that it will allegedly suffer antitrust injuries from Defendant's practices. However, Dr. Ramey's declaration, filed on October 24, 1997, states that he recently sold his practice and that he is currently taking a sabbatical, but that he later intends to return to work as an independent contractor at his former practice. Were the Court not granting summary judgment to Defendant, it would need to consider whether these facts would affect this lawsuit.

2. These patients are sometimes referred to as "PFMC-affiliated patients" in this Order. However, it is important to note that the patients do not have a direct relationship with Defendant, nor are their health care choices controlled by Defendant. Their relationship with Defendant is based upon the contract between their insurer and Defendant.

Defendant contracts with third-party payors to make available its "panel" of preferred providers in accordance with its cost-containing advantages. Patients who are affiliated with these third-party payors through their insurance coverage or employee health benefit plans are then permitted to obtain services from preferred providers under whatever payment arrangements are established by the agreements between patients and their insurers. Typically, patients pay less money out of pocket when they visit a preferred provider, but they are not prohibited from seeking services from any doctor. In any case, the actual payments made by patients and by their insurers are governed by patients' insurance agreements, and not by Defendant.[3]

Defendant serves to bring together doctors on one side, and patients and their third-party payors on the other, by developing arguably mutually beneficial cost-containment strategies, including maximum fees for certain services. This system, a common framework among PPOs, enables insurance companies to permit their customers greater freedom to choose their doctor while reducing the companies' exposed risk to overbilling and providing greater assurance to patients that they will be reimbursed on a relatively more familiar and simple system than an *ad hoc* reimbursement plan.

Dr. Ramey[4] was a doctor-member of PFMC until 1989, when he claims that he quit due to conflicts about his billing practices. On June 6, 1995, Ramey reapplied for membership. His application included an explicit acceptance of Defendant's reimbursement policies, including the maximum-price schedules. On August 29, 1995, Ramey was informed that his application had been denied on the grounds that his "practice patterns have been found to be inconsistent with peer review norms adopted by the Foundation or that which is generally accepted in the community." Further letters to Ramey's counsel on February 16 and April 9, 1996, explain that the membership committee believed that Ramey had a history of billing for unnecessary tests and for "unbundling" extra charges that should have been included in a global fee (e.g., charging separately for office visit or supplies that should have been included in the fee charged for a performed procedure). Ramey declined invitations to appear for an interview or to appeal. On October 11, 1996, Plaintiff filed this antitrust action. Plaintiff seeks the following relief: (1) a declaration that Defendant has engaged in unlawful activities, (2) $2,000,000 in compensatory damages, to be trebled for violation of the antitrust laws, (3) a permanent injunction preventing Defendant from enforcing its maximum-fee schedule on doctors, and (4) costs and attorney's fees.

On February 4, 1997, the Court denied Defendant's motion to dismiss the suit. Both Plaintiff and Defendant have now submitted motions for summary judgment.

### III. Plaintiff's Claims

Plaintiff's first cause of action alleges that Defendant's refusal to accept Dr. Ramey as a member was an illegal group boycott that limits Plaintiff's access to PFMC-affiliated patients and handicaps its ability to compete in the market for ENT medical services. Plaintiff argues that the boycott (1) suppresses competition in ENT services, (2) prevents Plaintiff from competing for PFMC-affiliated patients, (3) shrinks Plaintiff's clientele, and (4) discourages Plaintiff from attempting new and innovative treatment techniques.

Plaintiff's second cause of action alleges that PFMC fixes prices for medical care by imposing maximum prices to be charged by its preferred providers. Plaintiff alleges that the price-fixing scheme stifles competition and innovation by rewarding the *status quo* and discouraging state-of-the-art medical care. Plaintiff further alleges that the scheme hinders its ability to compete for PFMC-affiliated patients and forces Dr. Ramey to accept the same compensation as less experienced doctors.

Plaintiff's third cause of action alleges that Defendant's rejection of Dr. Ramey's membership application was illegal because it was

---

3. In some cases, the contracts between Defendant and third-party payors provide that Defendant will process and collect payments for the payors.

4. Dr. Ramey, and not the Plaintiff, J. Allen Ramey, M.D., Inc., was a member of PFMC. Plaintiff itself did not apply for membership. See footnote 1 of this Order.

done in furtherance of its price-fixing scheme.

## IV. Discussion

### A. Standard of Law

On a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the moving party must first establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978). Summary judgment must be granted if the party responding to the motion fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the moving party has the initial burden of demonstrating that summary judgment is proper, that burden may be discharged by pointing out to the court an absence of facts to support the nonmoving party's case. *Id.* at 325.

The burden then shifts to the nonmoving party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. To make such a showing, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Id.* When considering whether summary judgment is appropriate, the Court should draw all reasonable factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the Court finds that judgment may be entered as a matter of law or that no reasonable factfinder could find in favor of a party, summary judgment is warranted. *Id.* at 249–52.

### B. Price-Fixing

■ Although Plaintiff's complaint alleges three separate causes of action, the heart of this suit is the allegation, found in the second cause of action, that Defendant's member-doctors conspired to fix a maximum price for ENT medical services in the San Diego market. Agreements by competitors to fix prices are "unlawful per se under the Sherman Act, and ... no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In 1982, the Supreme Court applied this standard to horizontal maximum price-fixing conspiracies in the medical arena in *Arizona v. Maricopa County Medical Society, et al.*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

In *Maricopa*, the State of Arizona brought suit against two large medical societies and their respective "foundations for medical care." The defendants commanded the membership of large percentages of the practicing doctors in Maricopa and Pima Counties of Arizona.[5] The foundations adopted schedules establishing maximum prices for a variety of medical services. Their boards of trustees calculated "relative values" and "conversion factors" used to compute fees, and these schedules were submitted to the entire doctor-membership for approval by majority vote. Member-doctors agreed to charge no more than the maximum fee to any patient insured by a foundation-endorsed plan. Insurance policies typically permitted their insureds to visit any doctor but required them to pay any excess amount charged by the non-member physician. The Supreme Court held that, as a horizontal price-fixing agreement, the foundations' fee schedules constituted per se violations of § 1 of the Sherman Act. It was essential to *Maricopa*'s determination of per se illegal horizontal price restraints that prices were fixed by doctors themselves. *Maricopa*, 457 U.S. at 352–355.

Defendant argues, and the Court finds at least plausible, that the instant case is distinguishable from *Maricopa* because doctors did not themselves establish the price schedules, and because each doctor acted individually. This argument could be construed as an attempt to characterize the price-fixing as vertical (vertical maximum prices are no longer per se illegal, *State Oil Co. v. Khan, et*

---

5. The Maricopa Foundation represented 70% of the practitioners in Maricopa County. *Maricopa*, 457 U.S. at 339. The Supreme Court was unable to determine precisely the membership of the Pima Foundation, noting that a 1975 publication reported 80% membership, while an affidavit filed in 1978 as part of the case reported 30%. *Id.* at 340 n. 8.

*al.,* —— U.S. ——, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), and maximum medical prices vertically imposed by insurance companies in another case were found not to violate the antitrust laws, *Barry v. Blue Cross of California,* 805 F.2d 866 (9th Cir.1986)). In the alternative, Defendant may be arguing that, even if it cannot be said to have a vertical relationship with its doctor-members, *Maricopa* still does not apply because the doctors themselves did not fix prices, but instead only made individual decisions to accept or reject fee schedules established by the actuary.

While Defendant's arguments may have merit, Plaintiff has at the least stated a case that bears a strong resemblance to *Maricopa.* It therefore is appropriate at this stage to determine whether, viewing the complete record before the Court, Plaintiff is entitled to bring a private cause of action pursuant to the Clayton Act. Therefore, the Court will first assume, *arguendo,* that Defendant's practices are congruous with those found to be per se violations in *Maricopa.*

## C. Antitrust Injury

### 1. Standard of Law.

■ The Sherman Act does not authorize private causes of action. The available remedies for private plaintiffs are found in the Clayton Act, which authorizes certain antitrust suits for monetary relief (§ 4) and injunctive relief (§ 16). 15 U.S.C. §§ 15, 26. "A private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing 'injury causally linked to an illegal presence in the market.'" *Atlantic Richfield Co. (ARCO) v. USA Petroleum,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). To proceed under the Clayton Act, a private plaintiff must show that he suffered an "antitrust injury" by showing that his injury resulted directly from the defendant's anticompetitive acts, that the harm was of the type that the antitrust laws are intended to prevent, and that the injuries reflect the anticompetitive effect of the violation. *Brunswick,* 429 U.S. at 488–489. The activities of a monopolist or cartel may indeed injure a competitor through increased competition, but such harm does not create a private right of action. The antitrust injury requirement is purposed on the maxim that antitrust laws were enacted for the "protection of competition, not competitors." *Id.,* 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). The requirement is not derived from constitutional standing, but instead from prudential concerns about potential misappropriation of antitrust law for unintended purposes.

■ The antitrust injury requirement applies to plaintiffs even when they are alleging per se antitrust violations. *See ARCO,* 495 U.S. at 341–346. *ARCO* involved allegations of vertical, maximum price-fixing. At the time *ARCO* was decided, vertical maximum price-fixing was illegal per se, as established in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (*Albrecht* was overruled in *State Oil Co. v. Khan, et al.,* —— U.S. ——, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997)). In *ARCO,* the Supreme Court rejected the plaintiff's argument that antitrust injury can be inferred by the existence of per se violations. The Court determined that the purpose of the antitrust injury requirement was unrelated to the factors that guide per se versus rule-of-reason analysis, and that "proof of a per se violation and of antitrust injury are distinct matters that must be shown independently." *ARCO,* 495 U.S. at 344 (quoting 2 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 334.2c, p. 380 (1989 Supp.).

■ The Court must be particularly sensitive to the antitrust injury requirement in this case because Plaintiff is a competitor, not a consumer. As the Seventh Circuit has noted, "competitors' theories of injury under section 4 deserve particularly intense scrutiny.... [W]henever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury.' If, as in *Brunswick,* itself, the plaintiff and defendant are competitors, the plaintiff gains from higher prices and loses from lower prices—just the opposite of the consumers' interest. When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d

1409, 1419 (7th Cir.1989) (citations omitted). *See also* 2 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 373a, p. 275 (1995 ed.) ("Because a competitor opposes efficient, aggressive, and legitimate competition by his rivals, he has an incentive to ... use an antitrust suit to delay their operations or induce them to moderate their competition. For that reason, the courts should be skeptical of a plaintiff's claims that his rivals have violated the antitrust laws and caused ... antitrust injury.")

While the precise legal standards are stated elsewhere in this Order, it cannot be said too often that the only injuries that qualify as antitrust injuries are injuries of the type that Congress intended to protect when they adopted the antitrust laws. The definition does not include other injuries directly caused by acts clearly prohibited by the antitrust laws. Nor does the definition include injuries to an individual business' competitiveness (i.e., being forced out of business) that are ultimately caused by fair market forces, even in the presence of clear antitrust violations.

■ The Court must therefore examine the nature of Plaintiff's alleged injuries. To review possible bases for antitrust injury caused by a maximum-price scheme, the Court will focus its evaluation on two cases: (1) *ARCO*, in which the Supreme Court considered whether a competitor could establish antitrust injury from a vertical maximum price-fixing conspiracy; and (2) because *ARCO* involved vertical price-fixing, the Court will evaluate potential theories of antitrust injury unique to a horizontal price-fixing scheme as contemplated in *Maricopa*.

### 2. *ARCO*

While *ARCO* involved vertical price-fixing, its analysis of competitor antitrust injury allegations is highly instructive. The plaintiff, USA Petroleum Company (USA), was an independent retail marketer of gasoline that purchased gasoline from major petroleum companies for resale under its own brand name. The defendant, Atlantic Richfield Co. (ARCO), was an integrated oil company that sold its gasoline to consumers directly through its own stations and indirectly through ARCO-brand dealers. In the early 1980s, ARCO developed a marketing strategy to compete with independent, discount gasoline retailers. The strategy included the elimination of credit card sales and the provision of short-term discounts to retailers to enable them to match retail prices offered by independents. USA sued, alleging that ARCO conspired to fix maximum prices at artificially low levels in violation of § 1 of the Sherman Act.

The district court granted summary judgment for ARCO on the § 1 claim, finding that "[e]ven assuming that [USA] can establish a vertical conspiracy to maintain low prices, [USA] cannot satisfy the 'antitrust injury' requirement of Clayton Act § 4, without showing such prices to be predatory." *ARCO*, 495 U.S. at 333 (internal quotations omitted). A divided panel of the Ninth Circuit reversed, but the Supreme Court granted *certiorari* and reversed.

The Supreme Court wrote that an injury, "although causally related to an antitrust violation, nevertheless will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *ARCO*, 495 U.S. at 334 (internal punctuation and citations omitted). The Court rejected the notion that the antitrust injury requirement can be satisfied by a showing that the long-term effect of the allegedly violative conduct would ultimately reduce competition. *Id.* at 337 n. 7. "Rivals cannot be excluded in the long run by a nonpredatory maximum-price scheme unless they are relatively inefficient." *Id.* (citations omitted).

Plaintiff has not alleged that Defendant's prices are predatory. Even if it had, it appears highly unlikely that such a claim could be supported.[6] Therefore, *ARCO* suggests

---

6. A defendant's behavior may fairly be characterized as predatory when the defendant is "attempting to exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (citations omitted). Bare allegations of threatened predatory pricing are inadequate to establish antitrust injury; the circumstances must be such as to make such an allegation credible. "Courts should not find allegations of predatory pricing credible when the alleged predator is incapable

that Plaintiff has not suffered an antitrust injury in this case.

Plaintiff's supplemental brief does not attempt to distinguish *ARCO;* therefore, it must be relying on additional theories of antitrust injury based upon *Maricopa.*[7] However, before proceeding to those theories, the Court will first consider whether *ARCO* is dispositive.

A pre-*ARCO* Supreme Court case lends support for the proposition that the logic of *ARCO* applies in horizontal price-fixing schemes. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., et al.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In *Matsushita,* American television manufacturers sued twenty-one Japanese or Japanese-controlled corporations that manufactured and/or sold television sets in the United States, alleging that the Japanese companies, as horizontal competitors, had conspired to eliminate American producers by maintaining artificially low prices for their products in the United States. As horizontal price-fixing, the conspiracy would have been illegal per se under § 1 of the Sherman Act. The district court granted summary judgment for the defendants, finding that the plaintiffs had not presented sufficient evidence of a conspiracy to establish a triable issue of fact. The Third Circuit reversed, but the Supreme Court reversed the circuit.

The evidentiary issues upon which *Matsushita* turned are not relevant to this case. However, the opinion provides guidance regarding antitrust injury in horizontal price-fixing cases. The Court found that a plaintiff must "show that the conspiracy caused them

an injury for which the antitrust laws provide relief," *citing Brunswick,* 429 U.S. at 488–489, and that such a showing required proof that "petitioners conspired to price *predatorily* in the American market, since the other conduct in the alleged conspiracy cannot have caused such an injury." *Matsushita,* 475 U.S. at 584 n. 7 (emphasis added). In addition to dispelling any doubt that the antitrust injury requirement applies to suits alleging horizontal price-fixing, the language suggests that a *non-predatory* horizontal price-fixing conspiracy could not cause an antitrust injury.

Such an inference is not remarkable, given the Supreme Court's finding four years later in *ARCO* that a vertical maximum-price scheme could not cause antitrust injury unless it was predatory. From a competitor's vantage point, the exercise of a non-predatory, maximum-price scheme by another competitor or competitors should have the same or similar effects regardless of whether the price is established, for example, vertically by a competitor's franchisor or horizontally by a consortium of competing franchisees. In both cases, the uninvolved competitor is free from any constraints of the scheme, and is able to offer superior services if the maximum price is too low and to collect windfall profits if the price is too high. Regardless of who establishes prices, a competitor cannot be excluded from the market by a non-predatory maximum-price scheme unless the competitor is relatively inefficient. *ARCO,* 495 U.S. at 337 n. 7. Therefore, it appears that Plaintiff cannot establish an antitrust injury based upon Defendant's pricing policies.

of successfully pursuing a predatory scheme." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 120 n. 15, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). In this case, the record is void of any indication that Defendant possesses sufficient market power to pose a credible threat of predatory pricing.

7. Plaintiff's supplemental pleadings do not materially address *ARCO.* Instead, Plaintiff continues to repeat *Maricopa's* explanation of why the alleged acts were illegal per se. As this Order has explained, the applicability of the per se test is an entirely separate matter from antitrust injury. *ARCO,* 495 U.S. at 344. Antitrust injury was not part of the appeal before the Supreme Court in *Maricopa,* so its opinion does not address the issue. The *Maricopa* plaintiff, the state of Ari-

zona, should have been required to establish antitrust injury; only the United States is authorized to sue directly under the Sherman Act. At the time *Maricopa* was decided, some courts were less concerned with antitrust injury in injunctive relief suits, at least for a state government plaintiff. It is irrelevant for the purposes of this motion why *Maricopa* does not address antitrust injury; the law is clear that a private individual plaintiff must establish antitrust injury as a prerequisite for both legal and injunctive relief. However, the Court notes that Arizona could have alleged antitrust injuries from suppression of medical competition that would increase its public aid burden, or argued that it was suing on behalf of its consumers (the availability of the latter argument is debatable). These arguments are not available to Plaintiff in this case.

### 3. Potential Antitrust Injuries Contemplated by *Maricopa*

While it appears to be irrelevant to a determination of antitrust injury whether maximum prices are established vertically or horizontally, the Court will still evaluate any additional potential theories of antitrust injury unique to a medical, horizontal price-fixing scheme. *Maricopa* describes three potential types of injuries: (1) "a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases;" (2) "a restraint also may discourage entry into the market [8] and may deter experimentation and new developments by individual entrepreneurs;" and (3) a maximum price scheme "may be a masquerade for an agreement to fix uniform [i.e., minimum] prices, or it may in the future take on that character." *Maricopa*, 457 U.S. at 348. Plaintiff in this case has failed to establish an antitrust injury under any of these three categories.

#### a. Same Economic Rewards to All Practitioners

*Maricopa* expressed concern that a maximum price-fixing scheme would "provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases." However, such injury only could be suffered by doctors who participated in the price-fixing arrangement. They would be the ones who would receive the same

compensation regardless of their skill.[9] Plaintiff is not a member of PFMC, so it can charge whatever it likes and will be paid according to skill (as established by the market).

Plaintiff alleges that Defendant's maximum prices force it to lower its prices lest it price itself out of the market. Plaintiff's arguments imply that its services are worth more than the PFMC maximum. If patients do in fact so value Plaintiff's services, then Plaintiff should be able to attract customers, including PFMC-affiliated patients, regardless of Dr. Ramey's non-member status. PFMC-affiliated patients are permitted to patronize non-member providers; they are merely required to pay a deductible or some additional amount as prescribed by their agreement with a third-party payor. The additional cost could represent the premium value of a non-member provider's superior services. Patients who are unwilling to pay more for such services do not value it as such, and it is hardly unreasonable for these patients' third-party payors to seek to avoid paying for services not valued by their insureds. If Plaintiff is losing business to Defendant's preferred providers, it is because of their lower net prices offered to patients, and not because of any conspiracy to suppress competition.[10]

#### b. Experimentation and Innovation

*Maricopa*'s next concern was that a horizontal price-fixing conspiracy could deter experimentation and innovation. Plaintiff argues that Defendant's maximum prices may force it to abandon expensive laser techniques and other advanced services.[11]

---

8. Plaintiff has already entered the market. Therefore, it cannot suffer an antitrust injury related to barriers to market entry.

9. A court might reject a member-doctor's allegation of antitrust injury on the grounds that the doctor voluntarily agreed to the maximum-price policy.

10. The Court recognizes that many PFMC-affiliated patients will never even be aware of Plaintiff's availability. However, Defendant has no duty to advertise Plaintiff's services and is not prohibited from encouraging patients to patronize preferred providers. The Ninth Circuit noted in a similar, but vertical, case involving maximum medical prices established by an insurance company, "We agree that paying lower benefits for treatment by nonparticipating physicians

greatly discourages patients from using such physicians. This, however, is simply a consequence of every commercial contract .... The contract does not mean that the parties have agreed to an unlawful concerted refusal to deal. Under the Plan, the consumer still enjoys complete freedom to seek treatment from a nonparticipating physician.... Ordinary competitive market forces—lower prices—have simply reduced the demand for the nonparticipating physician's services." *Barry v. Blue Cross of California*, 805 F.2d 866, 872 (9th Cir.1986).

11. Defendant notes that its pricing policies contemplate and provide for the use of advanced services, including lasers, when such services are warranted under Defendant's practice standards. It also appears that a review process exists to consider atypical cases.

**1364**

To the contrary, Defendant's prices should not deter *competitive* experimentation or innovation by non-member competitors. Plaintiff is free to charge whatever prices he can command. If the market values a service that is too expensive to be offered by member-doctors within the rules of Defendant's maximum-price policy, then the price-fixing scheme would actually *help* Plaintiff because it would enable it to offer valued services effectively closed to PFMC-affiliated doctors. However, if consumers are not willing to pay for more costly services, they would not patronize those services regardless of the prices for alternative services. The antitrust laws do not require the market to subsidize underappreciated products to ensure their "competitiveness."

*Maricopa*'s real concern was not for non-participating doctors such as Dr. Ramey, nor the participating doctors who voluntarily agreed to limits. The Court's concern was that if too many doctors were participating in the conspiracy, advanced techniques could become unavailable to consumers who would otherwise be willing to pay for them. A patient who needs and could pay for a complicated $300,000 heart transplant operation would be injured if doctors refused to perform the additional services because they could not charge more than $200,000. Consumers, not doctors, are the victims of this type of antitrust violation.

### c. Disguised Minimum Prices

*Maricopa*'s third concern was that a maximum-price scheme can be a masquerade for a more harmful minimum-price scheme. *Maricopa*, 457 U.S. at 347–348. However, as a competitor, Plaintiff could only benefit from artificially high prices. "A competitor 'may not complain of conspiracies that ... set minimum prices at *any* level.'" *ARCO*, 495 U.S. at 337 (quoting *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 8, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis original)). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury." *ARCO*, 495 U.S. at 340. The *ARCO* Court added that "[r]ivals cannot be excluded in the long run by a non-preda-

tory maximum-price scheme unless they are relatively inefficient," *Id.* at 337 n. 7, and that a "firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it is unable to raise prices." *Id.* at 337–338. As noted above, Plaintiff has not alleged that Defendant's prices are predatory. Therefore, no basis for antitrust injury exists under this theory.

### 4. Plaintiff Has Not Suffered An Antitrust Injury

Plaintiff has not established any potential antitrust injuries contemplated by *ARCO* or *Maricopa*. Therefore, Plaintiff is injured, if at all, not by price-fixing but by the increased efficiency that results from Defendant's cost-containing operation.

Although Defendant has no apparent market power to produce such results, suppose that Plaintiff's injuries did force it out of business. While conduct that eliminates rivals reduces competition, reduction of competition does not invoke the Sherman Act until it harms consumer welfare. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.1995). Courts have repeatedly found that Congress designed the Sherman Act as a "consumer welfare prescription." *Id.* (quoting ROBERT H. BORK, THE ANTITRUST PARADOX 66 (1978)). Consumer welfare is maximized when economic resources are allocated to their best use and when consumers are assured competitive price and quality. *Id.* (citations omitted). Plaintiff has failed to demonstrate an injury to consumer welfare.

Therefore, even if Plaintiff is correct that Defendant's practices constitute a per se illegal restraint of trade, absent a showing of antitrust injury as defined in *Brunswick*, that claim is not Plaintiff's to make. Plaintiff has failed to establish that it can demonstrate antitrust injury at trial. Therefore, Defendant's motion for summary judgment must be granted as to Plaintiff's second cause of action.

### D. Rejection of Dr. Ramey as a Preferred Provider

Plaintiff's first cause of action alleges that Defendant's refusal to accept Dr. Ramey as a

member is an illegal group boycott because it limits Plaintiff's access to PFMC-affiliated patients and handicaps its ability to compete in the market for ENT medical services. Plaintiff's third cause of action alleges that Defendant's rejection of Dr. Ramey's application for membership was illegal because it was done in furtherance of its price-fixing scheme.

 The only plaintiff in this case is J. Allen Ramey, M.D., Inc. Dr. Ramey himself is not a plaintiff. The medical corporation of a solo practitioner does not have standing to contest a hospital's rejection of privileges for the individual doctor. *See Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1441 n. 1 (11th Cir.1991). Therefore, Defendant must be granted summary judgment as to Plaintiff's first and third causes of action.

 Even if Dr. Ramey himself were a plaintiff, he would still be required to establish antitrust injury, which, as discussed above, the corporation has failed to do. In any case, antitrust injury would be difficult to establish. If Defendant was not engaging in anticompetitive activities, then it had the right as a private enterprise to reject Dr. Ramey's application. Numerous courts have rejected § 1 claims based upon the rejection of privileges or membership in the medical arena. *See BCB Anesthesia Care v. Passavant Mem. Area Hosp.,* 36 F.3d 664, 667–668 (7th Cir.1994) ("Hundreds, perhaps thousands of pages in West publications are devoted to [such questions] ... [and they] almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act.").[12] If, on the other hand, Defendant's pricing polices represent an illegal, profitable price-fixing conspiracy, Dr. Ramey could not establish antitrust injury by arguing that he was prevented from participating in the illegal conspiracy. Dr. Ramey's application expressly stated his acceptance of Defendant's pricing policies. Participation in an illegal, anticompetitive conspiracy is not representative of the type of behavior the antitrust laws were designed to protect, and therefore a denial of such does not give rise to antitrust

injury under *Brunswick. See Local Beauty Supply, Inc. v. Lamaur, Inc.,* 787 F.2d 1197, 1201–1204 (7th Cir.1986) (distributor allegedly terminated for underselling a price-maintenance scheme did not suffer antitrust injury; right to receive supercompetitive profits achieved by participation in price-fixing conspiracy is not protected by Sherman Act).

Therefore, summary judgment against Plaintiff on these claims may be fairly based on more than the technicality (albeit an important one) that the complaint fails to name Dr. Ramey as a plaintiff.

## V. Conclusion

The Court denies Plaintiff's motion for summary judgment. The Court grants Defendant's motion for summary judgment as to all claims.

IT IS SO ORDERED.

---

12. In many cases, these determinations are made on their merits, reviewed under the rule of reason, rather than as a question of antitrust injury. However, the Court need not make such a deter-

mination since Dr. Ramey is not a party. The citations are provided to illustrate the unlikelihood that this cause of action could be successful.